# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORWOOD PROMOTIONAL PRODUCTS HOLDINGS, INC., *et al.*,[1] | Case No.: 09-11547 (PJW) |
| | Jointly Administered |
| Debtors. | Re: Doc Nos. 101, 189 & 192 |

| | |
|---|---|
| In re: | Chapter 11 |
| NORWOOD PROMOTIONAL PRODUCTS HOLDINGS, INC., *et al.*, | Case No.: 09-11547 (PJW) |
| | Jointly Administered |
| Debtors. | Adv. No. 09-51059 |
| Official Committee of Unsecured Creditors of Norwood Promotional Products Holdings, Inc., *et al.* | |
| Plaintiff, | |
| vs. | |
| Norwood Promotional Products, Inc.,<br>Norwood Operating Company, LLC,<br>The Bank of New York Mellon, as Agent for the Existing Bank Group (Term A Lenders),<br>Oppenheimer Senior Floating RA,<br>Oppenheimer Master Loan Fund,<br>Satellite Senior Income Fund,<br>Atrium III,<br>Credit Suisse Asset Mgmt SLF,<br>Madison Park Funding II, Ltd.,<br>Atrium V, | |

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification numbers, are: Norwood Promotional Products Holdings, Inc. (9391); Norwood Promotional Products, Inc. (4534); Norwood Operating Company, LLC (3446); Advertising Unlimited, LLC (4435); The McCleery-Cumming Company, LLC (2652); and Renaissance Publishing Company, LLC (2740). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 10 W Market Street, Suite 1400, Indianapolis, Indiana 46204.

First Dominion Funding III,
Atalaya Funding II LLC,
Jefferies Buckeye Master Fund,
Continental Casualty Company,
Allstate Life Insurance Co,
AIMCO CLO, Series 2005-A
AIMCO CLO, Series 2006-A,
Longacre Capital PRT QP LP,
Longacre Master Fund, Ltd.,
Merrill Lynch Credit Prod, LLC,
Nuveen Senior Income Fund,
Epic Distressed Debt OPRT MSTR Fund Ltd,
Archimedes Funding III, Ltd.,
Centurion CDO III, Limited,
Doe Term A Lender Defendants Nos. 1-25,

     Defendants.

**OBJECTION OF THE BANK OF NEW YORK MELLON, AS AGENT FOR THE TERM A LENDERS, TO THE MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS PURSUANT TO SECTIONS 105 AND 363(k) OF THE BANKRUPTCY CODE FOR AN ORDER PROHIBITING OR TEMPORARILY DISALLOWING SETOFF RIGHTS WITH RESPECT TO THE TERM A LENDERS' ABILITY TO CREDIT BID OR, IN THE ALTERNATIVE, REQUIRING AN AMOUNT EQUAL TO THE PURCHASE PRICE TO BE DEPOSITED IN AN ESCROW ACCOUNT UNTIL THE DATE THE CHALLENGE IS RESOLVED**

**—AND—**

**OBJECTION OF THE BANK OF NEW YORK MELLON, AS AGENT FOR THE TERM A LENDERS, TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION[2]**

The Bank of New York Mellon ("BNYM"), in its capacity as agent for the lenders under

the Third Amended and Restated Credit Agreement, dated as of August 16, 2004 (the "Term A

---

[2]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Credit Bid Disallowance Motion, the Complaint, the TRO/Preliminary Injunction Motion, the Bid Procedures and Sale Order Motion, the Stalking Horse Agreement, the Bidding Procedures, or the Bidding Procedures Order.

Credit Agreement"), by and among Norwood Promotional Products, Inc. ("NPPI" or "Opco"), each of NPPI's subsidiaries, BNYM as Administrative Agent (in such capacity, the "Term A Agent") and the lenders party thereto (the "Term A Lenders"), hereby files this objection (the "Objection") to (I) the Motion of Official Committee of Unsecured Creditors Pursuant to Sections 105 and 363(k) of the Bankruptcy Code for an Order Prohibiting or Temporarily Disallowing Setoff Rights With Respect to the Term A Lenders' Ability to Credit Bid or, in the Alternative, Requiring An Amount Equal To The Purchase Price to be Deposited in an Escrow Account Until the Date The Challenge Is Resolved (the "Credit Bid Disallowance Motion") and (II) the Official Committee of Unsecured Creditors' Motion For Temporary Restraining Order and Preliminary Injunction (the "TRO/Preliminary Injunction Motion").  For the reasons set forth herein, the Term A Agent requests that the Court (i) deny the Official Committee of Unsecured Creditors' (the "Committee") Credit Bid Disallowance Motion, (ii) deny the Committee's TRO/Preliminary Injunction Motion, (iii) allow the Term A Agent to credit bid up to the full amount of its $133.8 million secured claim (subject to the terms and conditions described below), and (iv) grant such other relief as it deems just and proper.

## PRELIMINARY STATEMENT

1.     In the TRO/Preliminary Injunction Motion, the Committee requests that the Court issue a preliminary injunction and final injunction or a temporary restraining order ("TRO") "prohibiting the Term A Lenders from credit bidding at the Auction", amongst other things. See TRO/Preliminary Injunction Motion, ¶ 26-27.  The Committee erroneously alleges that such relief is necessary because it "has no adequate remedy at law for the injuries and potential injuries it will suffer" unless the Court grants its requested relief. See id., ¶ 25.

2.  The Committee is not entitled to such extraordinary relief because, among other things, the Committee incorrectly asserts that the Term A Agent is not entitled to credit bid its secured claim under Section 363(k) based on an alleged bona fide dispute regarding the validity of the Term A Lenders' liens on NPPI and NOC's assets.  No "cause" exists to justify prohibiting the Term A Agent from credit bidding its secured claim because the potential risk that the Term A Lenders would be unable to fund the estate for any disallowed portion of its credit bid, if its liens are ultimately avoided, is minimal or non-existent for the reasons discussed below.

3.  Moreover, balancing the harms, it is clear that the Term A Lenders would be irreparably harmed if a preliminary injunction or TRO is entered and the Term A Agent is prohibited from credit bidding, while what little harm, if any, the Committee may face cannot be irreparable because the Term A Agent is prepared to condition its bid in a manner which ensures the appropriate recovery to unsecured creditors.

4.  The Term A Lenders — and ultimately the estate and unsecured creditors themselves — will be substantially and *irreparably* prejudiced if the Credit Bid Disallowance Motion and the preliminary injunction or TRO are granted to prohibit the Term A Agent from credit bidding its $133.8 million secured claim.  As the bid deadline is 4 p.m. on June 16, 2009, two hours after the TRO/preliminary injunction issue will begin to be heard, any "temporary" injunction will, in effect, be a final adjudication of the merits of the Term A Agent's credit bid rights.  The effect of any such order would be to eviscerate the Term A Agent's ability to bid/counter-bid and chill, or effectively end, any hope of a competitive auction process.  With no other Qualified Bidders anticipated to come to the table to push for a higher and fairer price, Aurora will, *fait accompli,* seize the company and its value with its low stalking horse bid

leaving the Term A Lenders and unsecured creditors with substantially lower recoveries than otherwise. However, if the Term A Agent is permitted to credit bid the full value of its secured claim (subject to the terms and conditions described herein) a competitive auction can occur, creating an opportunity to drive upward the best and highest offer and allowing a fair return to all creditors of the estate.

5.     Moreover, the Committee vastly overstates the potential prejudice unsecured creditors face if the Term A Agent is allowed to credit bid its full secured claim, then subsequently has its liens avoided. See Credit Bid Disallowance Motion, ¶¶ 17, 32. Most importantly, the Committee cannot show an "irreparable" injury because any resulting harm would be minimal and the Term A Agent is prepared to condition its bid in a manner which protects the unsecured creditors' recoveries. Further, the Committee makes the erroneous argument that because a bona fide dispute exists with respect to certain of the Term A Lenders' collateral due to alleged deficiencies in their Delaware financing statements, that the Term A Agent should be prohibited from credit bidding its secured claim. See Credit Bid Disallowance Motion, ¶¶ 1-2, 23-33. However, under Section 363(k), the Court should only prohibit a secured creditor from credit bidding its secured claim for "cause", including the *relative risk* that the secured creditor will ultimately be unable to fund its credit bid for the benefit of the estate's creditors, if the Court subsequently determines that the secured lenders do not hold valid, enforceable secured claims. Here, the Committee has failed to properly assess such risk. In fact, such potential risk is effectively non-existent as set out below and throughout this Objection.

6.      Any risk to the Committee and unsecured creditors is minimal and/or non-existent for the following reasons:

a.      The Committee fails to recognize that if the Court ultimately avoids the Term A Lenders' perfected liens and security interests, the Term A Lenders would swell the value of unsecured claims and dilute their recoveries such that approximately 97% of the value Term A Lenders would be required to provide to the estate would be round-tripped back to the Term A Lenders (i.e., the Term A Lenders will be 97% of the class of unsecured credtiors).  Thus, the Term A Lenders would ultimately only be responsible to pay the estate for approximately 3% of any disallowed credit bid and the Term A Agent now is prepared to condition its credit bid on "pre-paying" cash in such amount (as described below).

b.      The Committee only alleges a *bona fide* dispute with respect to a subset of the Term A Lenders' liens and collateral.  Thus, any subsequent avoidance would be limited to only a portion of the credit bid, rather than its full value. Thus, a blanket prohibition on credit bidding or requirement to fund the full credit bid amount in escrow is not justified.  Specifically, the Committee does not challenge the validity of liens on collateral worth a conservatively estimated aggregate value of $18.3 million and there is no bona fide dispute that the Term A Lenders are entitled to credit bid such proceeds.

c.      The Committee also does not address or dispute the Term A Lender's ability to credit bid its contractual right to proceeds on outstanding secured claims of approximately $21.2 million under the Mezzanine Credit Agreement.

d.      The Committee has failed to show a *bona fide* dispute with respect to avoiding all of the Term A Lenders' security interest in collateral perfected by the Delaware financing statements.  The Committee argues that the financing statements filed in Delaware are avoidable because the liens were "perfected" within 90 days prior to the Petition Date.   However, the Committee fails to recognize that these liens were originally perfected on or about 2002 when the Term A Agent (or its predecessor) initially filed financing statements in Delaware.  The Committee fails to cite a single case which holds that re-perfecting a lapsed security interest during the preference period is subject to avoidance under Section 547(b).   In addition, the Committee fails to address the Term A Agent's clear "contemporaneous exchange" defense under Section 547(c)(1), as the financing statements were re-filed in March 2009, in connection with its entry into a forbearance agreement with the Debtors.

e.      Finally, the Term A Agent is prepared to condition its bid on providing for appropriate cash payment to unsecured creditors for the value of their claims.  Moreover, the Term A Lenders believe they will be paying *more* to the unsecured creditors under their proposed bid than unsecured creditors would receive under the Aurora bid.  Since the unsecured creditors are being paid the appropriate value

of their claims in cash, any potential risk, outlined above, is entirely eliminated. The Term A Lenders have proposed to the Committee and are prepared to have the Court condition their credit bid on:

    i. A minimum bid of approximately $105 million which is approximately $4.5 million higher than the Aurora stalking horse bid;

    ii. Additionally, assumption of approximately $38 million of existing liabilities. Approximately $10-12 million of this amount represents claims which otherwise would be general unsecured claims. In this way, these claims will be paid in full such that the Term Loan Lenders will have effectively permitted themselves to be primed;

    iii. Of the $105 million bid, $24.6 million will be paid in cash on account of (a) the outstanding DIP ($12.8 million), (b) break-up fee ($3.3 million), (c) L/C collateralization ($2.1 million), (d) professional fees/success fees ($4.8 million), (e) estate wind down and other administrative claims ($1 million), and (f) $800,000 to unsecured creditors. The $800,000 cash payment to unsecured creditors is based on the Aurora bid providing cash of $66.3 million to the estate. $39.5 million of this amount would be paid to the Term A Lenders on account of their unchallenged liens, leaving $26.8 million to be shared among unsecured creditors (specifically, the Term A Lenders' $94 million claim (97%) and the general unsecureds' $2.6 million claim (3%)($26.8 x 3%=$800,000)). Moreover, the Term A Agent proposes sharing any potential upside of higher bids with the unsecureds at the same proportion 3%, including, if the Term A Agent is the winning bidder, paying cash in this amount to other unsecured creditors.[3]

7. Taking into account all of these considerations, it is evident that any potential risk to the estate and unsecured creditors with respect to the Term A Agent's credit bid is minimal or non-existent. Therefore, the Court should reject the Committee's Credit Bid Disallowance Motion and TRO/Preliminary Injunction Motion based on the substantial and irreparable harm any such disallowance and/or injunction would cause to the Term A Lenders (and other constituencies of the estate). The merits of the claim do not justify prohibiting the Term A Agent from credit bidding its secured claim. Moreover, the Committee will not be irreparably harmed, because even if the Term A Lenders' liens are ultimately avoided, the

---

[3] The numbers provided herein are based on information provided by the Debtors, the Committee and their professionals. To the extent the numbers change or additional information is provided, the Term A Agent and Term A Lenders reserve all rights.

potential harm to the Committee is minimal and the Term A Agent is prepared to condition the bid in a manner which protects the unsecured creditors' appropriate recoveries.

## **RELEVANT PROCEDURAL HISTORY**

8.      On May 5, 2009, the Debtors moved for an order approving bid procedures and for an order approving the sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances and interests (the "Bid Procedures and Sale Order Motion") (Docket No. 21).

9.      In connection with the Bid Procedures and Sale Order Motion, the Debtors selected an Aurora entity as the stalking horse bidder.  Aurora purports that its bid provides $132.5 million in value in exchange for the Debtors' assets (including $31.5 million in assumed liabilities).  See Promotional Holdings, LLC Asset Purchase Agreement, dated as of May 5, 2009 (the "Stalking Horse Agreement"), Art. III, §3.1 ("Consideration").  However, the Aurora bid and assumed obligations continues to change day-by-day making it difficult to assess its value.

10.     On May 21, 2009, the Court entered its Bid Procedure Order.  (Docket No. 101).  The Bid Procedures Order provides, *inter alia*, that the Term A Agent shall be deemed a Qualified Bidder to the extent its sets forth a bid for the Assets that, in addition to any credit bid under Section 363(k) of the Bankruptcy Code, provides for:  (a) the payment in cash of (i) all outstanding amounts under the DIP Facility as of the date of the closing of the Sale, and (ii) an amount equal to the Houlihan Carve-Out; and (b) the payment of cash into escrow of an amount equal to the Carve-Out Expenses.  See Bid Procedures Order at ¶ 19.  In addition, after oral

argument, the Court decided that the Term A Agent shall not be required to post a deposit in order to be deemed a Qualified Bidder.[4] See id., ¶ 30.

11. In addition, the approved Bidding Procedures provide that if the Term A Agent meets the requirements to become a Qualified Bidder that it "shall be entitled to credit bid the [Term A] Lenders' senior secured claims in accordance with section 363(k) of the Bankruptcy Code (i.e., the Agent Bid) to the extent of their allowed claim and lien." Bidding Procedures, ¶ 8. The Bidding Procedures were approved in their entirety as part of the Bidding Procedures Order. See Sale Order, ¶ 4.

12. On June 11, 2009, the Committee filed its Credit Bid Disallowance Motion, which requests that the Court enter an order precluding the Term A Lenders from credit bidding at the auction and requiring the Term A Lenders to deposit a dollar amount equal to the purchase price in an escrow account maintained by the Debtor, pending the later of the expiration of the Challenge Period and when litigation is resolved. Moreover, the Committee seeks an order to strike the provision in the Bid Procedures Order deeming the Term A Agent a Qualified Bidder.

13. By telephonic conference on June 12, 2009, the Court scheduled a hearing on the motion to be heard on June 16, 2009 at 2:00 p.m. (the "Credit Bid Hearing") prior to the 4:00 p.m. credit bid deadline.

14. In its Complaint, the Committee seeks a judgment "(a) avoiding the security interests in substantially all of the assets of NPPI and NOC that the Term A Lenders purported to prefect in March and April of 2009 ("2009 Security Interests"), pursuant to Sections

---

[4]     The Court, provided however, that if the Term A Lenders are the successful bidder and fail to close the transaction, the allowed secured claims of the Term A Lenders shall be reduced on a *pro rata* basis by the amount of the required deposit ($13,173,000) under the bidding procedures. See id.

547(b) and 544 of the Bankruptcy Code, and (b) preserving the avoided 2009 Security Interests for the benefit of the estate under Section 551 of the Bankruptcy Code." Complaint, ¶ 3.

15.     In its TRO/Preliminary Injunction Motion, the Committee "requests that the Court issue a preliminary injunction and final injunction (i) prohibiting the Term A Lenders from credit bidding at the Auction; and (ii) requiring that the proceeds from the Sale to the extent available to pay the Term A Lenders be held in escrow pending a final resolution of the Complaint." TRO/Preliminary Injunction Motion, ¶ 26. In addition, the Committee requests that this Court issue a temporary restraining order seeking the same relief. See id., ¶ 27. The Committee alleges that such relief is necessary because it "has no adequate remedy at law for the injuries and potential injuries it will suffer" unless the Court grants its requested relief. See id., ¶ 25. The TRO/Preliminary Injunction Motion will be heard, concurrently, as part of the Credit Bid Hearing.

## BACKGROUND

### A.     Term A Lenders Hold Valid, Enforceable Liens On NPPI And Its Subsidiaries' Collateral

16.     In 1999, NPPI and Norwood Operating Company, LLC ("NOC"), Advertising Unlimited, LLC ("AU"), the McClery Cumming Company, LLC ("MCC") and Renaissance Publishing, LLC ("Renaissance", and together with NOC, AU and MCC, the "Subsidiaries", and together with NPPI, the "Borrowers") entered into a $140 million term loan with the Term A Agent and Term A Lenders under the Term A Credit Agreement. NPPI's obligations under the Term A Credit Agreement (the "Term A Obligations") are secured by a second-priority security interest in substantially all of NPPI and its Subsidiaries' assets. See Term A Security Agreement, § 3. As of the Petition Date, $133.8 million of Term A Obligations were outstanding. See Declaration of Keith A. Maib, Chief Financial Officer of Norwood

Promotional Products Holdings, Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions (the "Maib Declaration") (Docket No. 11), p. 15.

17.     To perfect the security interests under the Term A Credit Agreement and Term A Security Agreement, the Term A Agent filed mortgages and financing statements in the respective jurisdictions.  The Committee does not challenge the financing statements the Term A Agent filed against the assets of AU in Minnesota, against the assets of MCC in Iowa or against the assets of Renaissance in Indiana (the "Non-Challenged UCC Collateral").  See Credit Bid Disallowance Motion, p. 4.  The Term A Lenders estimate that this collateral has an aggregate value of at least $8 million.[5]   The Term A Lenders also filed valid mortgages against real properties worth a conservatively estimated aggregate amount of at least $10.3 million (the "Mortgaged Collateral").   The Committee does not challenge the validity of the Term A Lenders' security interests in the Mortgaged Collateral, which together with the Non-Challenged UCC Collateral (the "Non-Challenged Collateral") has an estimated aggregate value of $18.3 million.

18.     In addition, on February 22, 2002 the Term A Lenders filed valid and enforceable financing statements with the Delaware Department of State perfecting their liens on substantially all of NPPI and NOC's  assets.  These liens and collateral are the sole subject of the Committee's challenge (the "Challenged Collateral").  See Credit Bid Disallowance Motion, p. 8 – 10.

19.     Experiencing financial difficulties in the Spring of 2009, the Debtors triggered numerous events of default under their credit facilities, including failure to meet consolidated EBITDA and leverage ratio requirements.  See Maib Declaration, p. 19 - 21. At the

---

[5]     The Auburn AR and inventory alone is estimated at approximately $2.5 million.  In addition, certain artwork of Renaissance is estimated at approximately $5.5 million.

request of the Borrowers, the Term A Agent entered into a Forbearance Agreement and Limited Waiver dated as of March 23, 2009 (the "Forbearance Agreement") in which the Borrowers acknowledged certain existing and probable events of default under the Term A Credit Agreement and the Term A Lenders agreed to forbear from exercising valuable enforcement rights through April 30, 2009. Moreover, the Term A Lenders agreed to waive the mandatory prepayment of $12 million in cash of insurance proceeds and authorized the Borrowers to use the proceeds to pay down the Revolving Credit Facility. In connection with the execution of the Forbearance Agreement and recognition that the Delaware financing statements may have lapsed for a period of time, the Term A Agent re-filed valid and enforceable financing statements with the Delaware Department of State, on March 31, 2009 and on April 3, 2009.

**B.**    **Term A Lenders Hold Contractual Rights To Mezzanine Proceeds Which They Are Entitled To Credit Bid**

20.    In 2006, NPPI entered into that certain Note and Equity Purchase Agreement, dated as of July 17, 2006 (as the same has been and may be further amended, supplemented or modified from time to time in accordance with its terms, the "Mezzanine Agreement"), by and between NPPI and its Subsidiaries, as issuers, Norwood Promotional Products Holdings, Inc. ("Holdings"), BNYM, as administrative agent (in such capacity, the "Mezzanine Agent") and the securities purchasers from time to time party thereto (the "Mezzanine Note Purchasers"), pursuant to which NPPI and the Subsidiaries, as issuers, could issue secured notes with an available face amount of up to $20.0 million (the "Mezzanine Notes"). See Maib Declaration, p. 15.

21.    NPPI's obligations under the Mezzanine Agreement (the "Mezzanine Obligations") are secured by liens and security interests in substantially all assets of NPPI (the "Mezzanine Collateral"). The Committee has not challenged the validity of these liens (the

"Mezzanine Liens"). Moreover, because of the alleged lapse under the Term A Lender's Delaware financing statements, the Mezzanine Liens may have leapfrogged ahead of the Term A Lenders' Delaware liens in priority — the Mezzanine Liens are, thus, arguably senior to the Term A Lenders' Delaware liens under state law.[6] The outstanding balance of the Mezzanine Obligations is approximately $21.2 million.

22.    To determine their respective rights, the Term A Agent and Mezzanine Agent entered into that certain Intercreditor and Subordination Agreement (the "Subordination Agreement"), dated as of July 17, 2006. Under Section 10 of the Subordination Agreement, the parties agreed that the Term A Lenders may step into the shoes of the Mezzanine Note Holders and collect any distributions which, if not for the Subordination Agreement, would be otherwise payable to the Mezzanine Note Holders. Thus, the Term A Lenders are entitled to the proceeds of the Mezzanine Note Holders' $21.2 million secured claim, and are entitled to credit bid that claim.

## ARGUMENT

### I.    The Committee Fails To Satisfy The Standards Justifying The Extraordinary Remedy of A Temporary Restraining Order or Preliminary Injunction

23.    An injunction is "an extraordinary remedy, which should be granted only in limited circumstances." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989)).

24.    To establish grounds for the entry of a preliminary injunction, the movant must demonstrate "(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and

---

[6]    The Term A Agent reserves all rights to timely answer the Complaint filed in the TRO/Preliminary Injunction Adversary Proceeding and nothing herein shall be deemed an admission or waiver.

(4) the public interest." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir. N.J. 2002) (citing Clean Ocean Action v. York, 57 F.3d 328, 331 (3d Cir. 1995).

25.     "In order to demonstrate irreparable harm the [moving party] must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3d Cir. 1989).

26.     "Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." Novartis Consumer Health, Inc., 290 F.3d at 596 (citing Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 226 (3d Cir. 1990).

27.     "The standards for issuing a preliminary injunction are the same as those for issuance of a temporary restraining order." FMC Corp. v. Control Solutions, Inc., 369 F.Supp.2d 539, 554 (E.D. Pa. 2005).

28.     Under these standards, the Court should reject the Committee's motion for a preliminary injunction or temporary restraining order to prohibit the Term A Agent from credit bidding because of the substantial and irreparable harm such injunction would cause to the Term A Lenders (and other constituencies of the estate) as discussed throughout this Objection. Moreover, the merits of the claim do not justify prohibiting the Term A Agent from credit bidding its secure claim. Furthermore, the Committee will not be irreparably harmed, because even if the Term A Lenders' liens are ultimately avoided, the potential harm to the Committee is

minimal and the Term A Agent is prepared to condition its bid in a manner which protects the unsecured creditors' appropriate recoveries.

## II. The Term A Agent Has The Right To Credit Bid Its Full $133.8 Million Secured Claim, As The Committee Has Failed To Demonstrate "Cause" To Prohibit Credit Bidding Under Section 363(k)

29.     Section 363(k) provides that "[a]t a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. §363(k).

30.     The purpose of credit bidding is to permit a secured creditor to bid the full value of its claims, rather than cash, to protect its economic interests in its collateral.  See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 459–61 (3d Cir. 2006).  Under 363(k), the holder of a lien may credit bid the full value of the claim unless the court, for cause, orders otherwise.  See id. (permitting a creditor to bid the full face value of both the secured and unsecured portion of its claim to ensure it received a full return on the value of its collateral).

31.     As stated by the Committee, some courts have found "cause" to decline to permit a secured creditor from credit bidding the full value of its secured claim, in part, because a bona fide dispute exists regarding the validity of the secured creditor's liens.  See, e.g., Nat'l Bank of Commerce of El Dorado v. L.D. McMullan (In re McMullan), 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996).  However, the focus of these courts is not simply on whether a bona fide dispute exists.  Rather, these courts focus on (i) the relative risk that the secured creditors' credit bid will ultimately be disallowed due to the avoidance of its liens and security interest and

(ii) the potential harm to the estate due to the inability of the secured creditor to make the estate whole on account of such disallowance. If the Court finds that there is little risk of harm to the estate, secured credit bidders have been permitted to bid without any limitations. In re Miami General Hospital, Inc., 81 B.R. 682, at 687–88 (S.D. Fla. 1988); In re Octagon Roofing, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (finding no cause to preclude bank from credit bidding disputed claim where there was no risk of loss to the estate).

32.    Courts place the burden to show "cause" on the party seeking to prohibit the secured party from credit bidding. When determining whether cause exists to deny the opportunity to credit bid because of a bona fide dispute over the validity of the lien, "merely alleging a dispute" is not enough. In re Octagon Roofing, 123 B.R. at 590. Instead, the objecting party must prove, with evidence, that there is an objective basis to conclude a legal or factual dispute exists regarding the validity of the asserted liens and security interests. In re N.J. Affordable Homes Corp., 2006 Bankr. LEXIS 4498, at *41 (Bankr. D.N.J. June 29, 2006) (collecting cases discussing standard to find whether bona fide dispute exists under § 363). If there is no bona fide legal or factual dispute, the estate is not harmed by the secured creditors' credit bid.

33.    Additionally, courts consider the potential prejudice to the secured creditor in the event it were not permitted to credit bid its claims. See Morgan Stanley Dean Witter Mortg. Capital, Inc. v. Alon USA LP (In re Akard St. Fuels, L.P.), 2001 U.S. Dist. LEXIS 21644, at *9 (N.D. Tex. Dec. 4, 2001).

34.    Here, the Committee requests that the Court enter an order prohibiting the Term A Agent from credit bidding any amount of its secured claim or, alternatively be required to fund its entire credit bid in escrow, based on mere allegations that the Term A

Lenders' may hold avoidable liens affecting some of their collateral. However, the Committee has failed to analyze the affect such avoidance may have on the estate and unsecured creditors. As discussed above and in more detail below, the estate and unsecured creditors will not be harmed even if the liens are subsequently avoided because the Term A Lenders are prepared to condition their bid in such a way so as to give unsecured creditors the full benefit of any claims they may have versus the Term A Lenders (notwithstanding that the Term A Lenders have valid defenses). Furthermore, the equities are in favor of allowing the Term A Agent to credit bid the full $133.8 million secured claim because the Term A Lenders and the estate will be substantially prejudiced by the inability of the Term A Agent to credit bid and force a competitive auction to improve Aurora's low stalking horse bid.

A. **The Committee Fails To Recognize That Any Recovery On Account Of A Disallowed Term A Agent Credit Bid Will Be Limited To 3% Because The Vast Majority of Such Value Is Attributable Back To The Term A Lenders**

35. Most importantly, as previously discussed in paragraph 6-a. above., the Committee fails to recognize that if the Court ultimately avoids any of the Term A Lenders' perfected liens that the Term A Lenders would swell the value of unsecured claims and dilute their recoveries such that approximately 97% of the value Term A Lenders would be required to provide to the estate would ultimately be round-tripped back to the Term A Lenders. Thus, the Term A Lenders would only ultimately be responsible to pay the estate for approximately 3% of any disallowed credit bid (and only that portion thereof that relates to liens which have been challenged).

**B.** **The Committee Has Failed To Allege a Bona Fide Dispute Or Risk That The Term A Lenders' Credit Bid Will Be Disallowed With Respect To Most, If Not All, Of The Term A Lenders' Collateral**

36.     The Committee has failed to allege a bona fide dispute or risk that the Term A Lenders' credit bid will be disallowed with respect to a most, if not all, of the Term A Lenders' collateral.

**i.**     **Term A Lenders Are Entitled To Credit Bid Up To The Full Value Of Their Claims On Non-Challenged Collateral**

37.     Under Section 363(k), a secured creditor can bid the full face value of its claims on certain collateral to ensure it receives a full return on the value of the collateral. See In re SubMicron Sys. Corp., 432 F.3d at 459–61. In an auction on a basket of assets including collateral and non-collateral, Courts will allocate value from the full bid price between the secured creditor's collateral and non-collateral assets in determining how much the secured creditor is entitled to credit bid. See In re Octagon Roofing, 123 B.R. at 589.

38.     Therefore, the Term A Agent is entitled to credit bid up to the full value of the Term A Lenders' claims on Non-Challenged Collateral which has an estimated aggregate value of at least $18.3 million. The Committee has not challenged the validity of the Term A Lenders' security interest in the Non-Challenged Collateral, thus, no bona fide dispute exists to show "cause" to prohibit the Term A Lenders from credit bidding the amount of their claim supported by this collateral.

**ii.**     **Term A Lenders Are Entitled To Credit Bid The Full Value Of The Mezzanine Note Holders' Claims Under the Mezzanine Liens**

39.     Section 551 preserves for the benefit of the estate any "transfer" avoided as a preference under Section 547. See 11 U.S.C. §551. The purpose of Section 551 is to ensure

that an avoided transfer actually benefits the estate, not just a party with a junior lien on the property. See Connelly v. Marine Midland Bank, N.A., 61 B.R. 748, 750 (W.D.N.Y. 1986).

40. However, the trustee merely steps into the shoes of the avoided party and succeeds to the priority the avoided party held under the avoided lien to determine relative priorities with competing security interests under state law. See In re Van de Kamp's Dutch Bakeries, 908 F.2d 517, 519 (9th Cir. 1990); Connelly, 61 B.R. at 750 ("[P]reservation alone does not enhance the status of trustee's lien; where second lienholder's perfected security interest has priority over first lienholder's unperfected security interest and trustee, having avoided first lien, may not assert priority over second lienholder's interest."); Colliers on Bankruptcy, ¶ 551.02.

41. Moreover, the trustee only succeeds to the avoided transfer or lien of a creditor, but not to that creditor's contractual rights under an intercreditor subordination agreement. See In re Kors, Inc., 819 F.2d 19, 24 (2d Cir. 1987) ("Bank's rights with respect to its unperfected security interest on [the Debtor's] collateral were separate and distinct from its rights under the subordination agreement among the lenders. Therefore, the trustee, acting under §§ 544(a)(1) and 551 obtained only those rights and powers derived from the unperfected security interest against [the Debtor] and did not acquire the rights of the Bank under the Subordination Agreement); Morris v. St. John Nat'l Bank (In re Haberman), 516 F.3d 1207, 1210-12 (10th Cir. 2008); see also Colliers on Bankruptcy, ¶ 551.02[1].

42. Thus, the Term A Lenders are entitled to credit bid the value of the Mezzanine Note Holders' $21.2 million outstanding secured claim under the Mezzanine Liens. While the trustee could presumably step into the Term A Agent's shoes relating to the Term A Liens under Section 551, the trustee cannot benefit from the Term A Lender's contractual

subordination and payment rights under the Subordination Agreement. Moreover, because the Mezzanine Liens may have leapfrogged the Term A Liens because of the lapse in the Term A Delaware financing statements, the Mezzanine Note Holders' rights are senior in priority to the trustee holding Term A Liens for the benefit of the estate. In sum, the Mezzanine Note Holders $21.2 million secured claim is senior to the Term A Lender's avoided lien and the Term A Lenders have the right to these proceeds under the Subordination Agreement and, therefore, can credit bid the full amount of the claim.

        **iii.**    **Term A Agent Is Entitled To Credit Bid The Secured Claims Under Their Delaware Financing Statements**

              **a.**    **Committee Has Not Met Its Burden To Demonstrate That The Term A Agent's Re-Filing of The Delaware Financing Statements To Continue Perfection Of Its Lapsed Security Interest Is Avoidable Under Section 547(b)**

43.       Section 547(b) allows the trustee, subject to defenses under Section 547(c), to avoid "any transfer of an interest of the debtor" within 90 days before filing if the trustee establishes that the five elements of 547(b) are met. <u>See</u> 11 U.S.C. §547(b). The burden is on the trustee to establish that the transfer is avoidable under Section 547(b). <u>See</u> 11 U.S.C. § 547(g).

44.       It is an open issue in the Third Circuit whether the reperfection of a lapsed security interest during the 90 day preference period is susceptible to attack as a preference under section 547(b). <u>See</u> <u>Mellon Bank, N.A. v. Metro Communications, Inc. v. Committee of Unsecured Creditors</u>, 945 F.2d 635, 644 (3d Cir. 1991) (explicitly declining to answer the question). Further, none of the cases cited by the Committee in its Credit Bid Disallowance Motion stand for such proposition. The decisions in <u>In re Visson</u> and <u>In re Criswell</u> are distinguishable because the courts were deciding whether the filing of an *initial*

financing statement during the preference period was avoidable, not whether the re-filing of financing statements and re-perfection of a lapsed security interest could be avoided. See 400 B.R. 215, 217 (Bankr. E.D. Wis. 2008); 102 F.3d 1411, 1415 (5th Cir. 1997). Furthermore, the terms of Section 547 allow the trustee to avoid a "transfer" which suggests a one-time event rather than a continuing perfection requirement. See 11 U.S.C. § 547(b), (e). A continuing perfection requirement should not be read into the statute where it is not required by the plain language.

45. Thus, the Committee has failed to show that a legal basis exists, in the Third Circuit, to avoid the Term A Lenders' perfected security interests under their Delaware financing statements.

> **b.** **Reperfection In Connection With The Forbearance Agreement Constitutes A Contemporaneous Exchange of Value Protected From Avoidance As A Preference**

46. Even if a trustee satisfied all the elements of 11 U.S.C. § 547(b), the re-filing of the financing statements during the preference period is not an avoidable transfer because it was made as part of a contemporaneous exchange of value protected under Section 547(c)(1). A trustee may not avoid a transfer "to the extent such transfer was – (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1).

47. New value is broadly defined in the Third Circuit to include "any consideration sufficient to support a contract." See Ross v. Philadelphia Hous. Auth. (In re Ross), 1997 Bankr. LEXIS 2352, at *18-19 (Bankr. E.D. Pa. June 10, 1997). Courts have found that forbearance may constitute new value. See Official Comm. Of Unsecured Creditors v.

Credit Suisse First Boston (In re Exide Techs., Inc.), 299 B.R. 732, 748 (Bankr. D. Del. 2003) (forbearance may constitute new value upon a showing of the value of the forbearance); In re M. Silverman Laces, 2002 WL 31412465, at *15 (S.D.N.Y. Oct. 24, 2002) (forbearance is value as it allows a creditor breathing room to facilitate rehabilitation). Specifically, the Third Circuit Court of Appeals has held that a bank's agreement to forgo for one year the payment of principal due on a loan constituted new value to the debtor. See In re Spada, 903 F.2d 971, 975 (3d Cir. 1990).

48.     In addition, the transfer and giving of new value to the debtor may be days apart and still be considered contemporaneous, the transfers need not be simultaneous. See Hechinger Inv. Co. of Del., Inc. v. Univsersal Forest Prods. (In re Hechinger Inv. Co. of Delaware, Inc.), 489 F.3d 568, 574-75 (3d Cir. 2007).

49.     Here, the Committee cannot show that there is a bona fide dispute where it has not put forward any counterargument to the Term A Lender's preference defense.

50.     The filing of the financing statements by the Term A Agent on March 31, 2009 and April 3, 2009 was a contemporaneous exchange for new value provided to the Debtors by the Term A Agent granting forbearance to the Debtor pursuant to the Forbearance Agreement on March 23, 2009. The forbearance by the Term A Agent under the Forbearance Agreement was intended to be a contemporaneous exchange for new value. Further, the filing of the financing statements and the forbearance by the Term A Agent were only days apart, and thus were substantially contemporaneous.

51.     The Term A Lenders should be credited with new value for the full amount of the Term A Lenders' claims as the Term A Lenders agreed to forgo valuable enforcement action as to all of its claim during the forbearance period. However, at the very

least, the Committee cannot argue that a bona fide dispute exists relating to the Term A Lenders agreement to waive the mandatory prepayment of $12 million of insurance proceeds. Such waiver constitutes hard value of a minimum $12 million and was clearly provided in the contemporaneous exchange of new value with the Debtors.

**C.  Unsecured Creditors Face Minimal And/Or No Risk In Connection With The Term A Agent's Credit Bid, As Its Bid Provides For The Payment Of The Value Of Unsecured Claims In Cash (In An Amount Greater Than Provided Under the Aurora Stalking Horse Bid)**

52.     Under the Term A Agent's proposed bid, the Term A Lenders provide for a cash payment to the unsecured creditors of the value their claims would receive under the Aurora bid (as set forth in ¶ 6-e.). The Term A Agent's proposed bid also permits unsecured creditors to participate in the upside of a competitive bidding process at their proportionate share of the unsecured creditor pool. Since the unsecured creditors are being paid the value of their claims in cash, any potential risk asserted by the Committee is entirely eliminated.

53.     Taking into account all of these considerations, it is evident that any potential risk to the estate and unsecured creditors with respect to the Term A Agent's credit bid is minimal and/or non-existent. Therefore, the Court should reject the Committee's Credit Bid Disallowance Motion and TRO/Preliminary Injunction Motion seeking to prohibit the Term A Agent from credit bidding, or requiring the Term A Agent to escrow the full purchase price, because of the substantial and irreparable harm such injunction would cause to the Term A Lenders (and other constituencies of the estate). The merits of the claim do not justify prohibiting the Term A Agent from credit bidding. Moreover, the Committee will not be irreparably harmed, because even if the Term A Lenders' liens are ultimately avoided, the potential harm to the Committee is minimal and the Term A Agent is prepared to condition the bid in a manner which protects the unsecured creditors' appropriate recoveries.

## **RESERVATION OF RIGHTS**

54.      The Term A Agent reserves all rights with respect to this Objection, including, but not limited to, the right to supplement its Objection at the Credit Bid Hearing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

# CONCLUSION

For the reasons set forth herein, the Term A Agent respectfully requests that the Court (i) deny the Committee's Credit Bid Disallowance Motion, (ii) deny the Committee's TRO/Preliminary Injunction Motion, (iii) permit the Term A Agent to credit bid its full $133.8 million secured claim, and (iv) grant such other and further relief as is just and proper.

Dated:  June 16, 2009          **MORRIS, NICHOLS,**
Wilmington, Delaware        **ARSHT & TUNNELL LLP**


           /s/ Robert J. Dehney
Robert J. Dehney, Esq.
Gregory W. Werkheiser, Esq.
1201 North Market Street, 18th Floor
Wilmington, DE 19899-1347
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

-and-

**BROWN RUDNICK LLP**
Jeffrey L. Jonas, Esq.
Andreas P. Andromalos, Esq.
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Facsimile:  (617) 856-8201


*Counsel To The Bank of New York  Mellon as*
*Administrative Agent for the Term A Lenders*

# 1662147